UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

            :

CARMEN SANTIAGO,            :

            :

         Plaintiff,        :

            :          18-cv-12012 (LJL)

    -v-          :

            :      OPINION & ORDER

AXIS SPECIALTY U.S. SERVICES, INC., KIMBERLY :
ROBINSON, WILLIAM GLASTAL, LATRELLE  :
MCKELLAR, TIM MADDEROM    :

            :

        Defendants.    :

            :

---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Carmen Santiago ("Santiago" or "Plaintiff"), a Hispanic woman, filed this action,

asserting claims of race and national origin discrimination under Title VII of the Civil Rights Act

of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title VII"), the New York State Human Rights

Law, N.Y. Exec. L. § 292(21)(c), ("NYSHRL") and the New York City Human Rights Law,

N.Y.C. Admin. Code § 8-107, *et seq*. ("NYCHRL").  She alleges that Defendant AXIS Specialty

("AXIS") failed to train her for discriminatory reasons and that this discrimination ultimately

resulted in her termination.  She also sues as individuals Kimberley Robinson ("Robinson"),

William Glastal ("Glastal"), LaTrelle McKellar ("McKellar"), and Tim Madderom

("Madderom") (collectively the "Individual Defendants"; collectively with AXIS,

"Defendants").  AXIS moves for summary judgment on all claims.  For the following reasons,

AXIS's motion is granted.

## FACTUAL BACKGROUND

The following facts, which are drawn from the parties' Local Rule 56.1 statement of facts, Dkt. No. 60, are undisputed unless otherwise indicated.

### A.      AXIS Specialty

AXIS is a professional liability insurance brokerage that offers accident, property, and other non-life insurance and reinsurance underwriting services.  Dkt. No. 60 ¶ 1.  AXIS has offices in New York City and in Alpharetta, Georgia, among other locations.  *Id*. ¶ 2.  The New York office houses a number of different divisions, including: Accident & Health, Casualty, Cyber & Technology, Environmental, Global Energy, Management Liability, Professional Liability, Program Business, and Property.  *Id*. ¶ 3.  Within the Casualty insurance division, there are two sub-divisions: Primary Casualty and U.S. Excess Casualty.  *Id*. ¶ 4.  Until January 2017, Underwriters in U.S. Excess Casualty were assigned either to the Retail division or the Wholesale division.  *Id*. ¶ 5.

At all relevant times, Madderom served as the Head of US Operations for AXIS.  *Id*. ¶ 7.  At all relevant times, McKellar served as Senior Team Leader for AXIS's New York office, *id*. ¶ 8, and Robinson served as the Senior Team Leader for the Property and Casualty divisions.  *Id*. ¶ 9.

### B.      Plaintiff's Employment with AXIS (2003-2016)

In January 2003, AXIS hired Santiago as a Senior Underwriting Assistant ("Senior UA") in the U.S. Excess Casualty department in the New York office.  *Id*. ¶ 15.  The job duties of a Senior UA consisted of supporting underwriters by performing administrative duties, including the triage of new and renewal business.  *Id*. ¶ 16.  Senior UAs were required to follow particular procedures to prepare renewal business ("Renewal Delegation") and to prepare new business

("New Business Delegation").  *Id.* ¶¶ 17, 18.  Senior UAs differed from Underwriting Assistants ("UAs") insofar as they were expected to serve in leadership roles as subject matter experts, to aid in training junior UAs and Underwriting Service Associates ("USAs"), and to operate at a higher level than UAs.  *Id.* ¶ 19.  During most of her time at AXIS, Santiago primarily supported Michael Wright ("Wright"), the Senior Vice President of U.S. Excess Casualty in New York.  *Id.* ¶ 20.

While she supported him. Wright did not ask Plaintiff to perform the more substantive job duties associated with the Senior UA role, such as Renewal Delegation and New Business Delegation.  *Id.* ¶ 22.  Instead, Wright had Santiago focus more of her time on the clerical aspects of the Senior UA job, such as folder creation, label set up, and correspondence.  *Id.* ¶ 23.  Other Senior UAs were required to perform more substantive work.  *Id.* ¶ 25.

In 2007, 2008, 2011, 2012, 2013, 2014, 2015, and 2016, Plaintiff received a "2 – met expectations" on her year-end performance review.  *Id.* ¶¶ 26, 27, 31, 33, 34, 35, 37, 43.  In 2009 and 2010, Plaintiff received a "1.5 – met some expectations."  *Id.* ¶¶ 28, 29.  She never received a rating higher than "2".

C.    The January 2017 Restructuring

In late 2016 or early 2017, AXIS eliminated the Retail division within U.S. Excess Casualty, which led to a company-wide restructuring and resulted in significant layoffs.  *Id.* ¶ 46. As a result of the restructuring, the Property division in New York was disbanded.  *Id.* ¶ 47.

Prior to the restructuring, there were three UAs in U.S. Excess Casualty: Plaintiff, Ronald Rosenking ("Rosenking") and Patricia Brown ("Brown").  *Id.* ¶ 49.  Rosenking and Brown were not Senior UAs; thus, Plaintiff was the only Senior UA in U.S. Excess Casualty.  *Id.*  As part of their job duties, UAs were required to delegate clerical tasks to USAs so that they could

prioritize their substantive tasks.  *Id*. ¶ 50.  As part of the restructuring, AXIS instituted a

heightened focus on the importance of UAs delegating clerical tasks to USAs, so that UAs could

devote more of their attention to substantive tasks such as Renewal Delegation and New

Business Delegation.  *Id*. ¶¶ 51, 52.

Santiago struggled with reducing her clerical work and focusing on the substantive

aspects of her job.  *Id*. ¶ 53.  On January 12, 2017, Robinson met with the UAs in U.S. Excess

Casualty to discuss expectations for 2017 for all UAs.  *Id*. ¶ 54.  After the meeting, Robison sent

Santiago, Brown, and Rosenking a copy of the Renewal Delegation guidelines and the New

Business Delegation processes.  *Id*. ¶ 55.

Prior to the restructuring, Santiago and Rosenking jointly supported Wright and Bob

Comstock, a UW in the Wholesale division whom Wright supervised.  *Id*. ¶¶ 56, 57.  Brown

supported the UWs assigned to the Retail division, including Glastal.  *Id*.  In conjunction with

the restructuring, the UWs in the Retail division were moved to the Wholesale division under

Wright's supervision.  *Id*. ¶ 58.  Due to the increase in UWs, AXIS began to shift U.S. Excess

Casualty toward a one-to-one UA-to-UW ratio.  *Id*. ¶ 59.  Robinson, McKellar and Wright

assigned Santiago to support Glastal.  *Id*. ¶ 60.  Due to the elimination of the Retail division

Glastal had moved from the Retail division to the Wholesale division and was still slowly

building his book of business.  *Id*. ¶ 61.  Plaintiff serviced both Glastal's remaining retail

accounts and his growing wholesale business.  *Id*. ¶ 63.

To assist with achieving the one-to-one UA-to-UW ratio, Aaron Moore ("Moore"), a UA

from Property, was moved into U.S. Excess Casualty.  *Id*. ¶ 67.  Moore is a black male.  *Id*. ¶

205.  Three other UAs in Property were terminated.  *Id*. ¶ 68.  Moore was assigned to support

Wright, as well as Simone Butler, another UW who had been transferred to the Wholesale

division from the Retail division. *Id.* ¶ 70. Butler, like Glastal, was rebuilding her book of business due to the reassignment. *Id.* ¶ 72.

      D.    <u>Moore's Early 2017 Training</u>

As a result of Moore's transfer from Property to U.S. Excess Casualty, AXIS determined that he required training. *Id.* ¶ 79. As such, from January 31, 2017 to February 3, 2017, Moore attended a training in Alpharetta, Georgia. *Id.* ¶ 82. Moore was the only UA in U.S. Excess Casualty who was invited to and participated in this particular training. *Id.* ¶ 83. The training covered aspects of the U.S. Excess Casualty business. *Id.* ¶ 84. Additionally, as part of AXIS's continuing efforts to have UAs spend less time on clerical tasks, the training included substantive tasks, including New Business Delegation and Renewal Delegation. *Id.* ¶ 86.

      E.    <u>The March 2017 Training</u>

After the restructuring, Plaintiff continued to struggle with performing her substantive responsibilities. *Id.* ¶ 91. As such, on March 3, 2017, Robinson scheduled a one-on-one session for Santiago to go through Renewal Delegation with Colleen Haustman ("Haustman"), the Unit Coordinator for AXIS's Alpharetta office. *Id.* ¶¶ 87, 92. Haustman concluded that Santiago could not perform a Renewal Delegation without assistance. *Id.* ¶ 94. Shortly thereafter, Robinson and Haustman scheduled an in-person training for all four of the U.S. Excess Casualty UAs during the week of March 13, 2017 to March 17, 2017. *Id.* ¶ 95. The training emphasized the substantive job duties of UAs and encouraged UAs to delegate clerical tasks. *Id.* ¶ 96. In advance of the training, Robinson instructed the UAs, including Plaintiff, to set aside new business or renewal accounts that they needed to work on so that they could review the accounts together during the training. *Id.* ¶ 97. Plaintiff attended the training on Monday, March 13, 2017. *Id.* ¶ 102. The training on Tuesday March 14, 2017 was cancelled due to a snowstorm, *id.*

¶ 103, and Plaintiff did not attend the training on Wednesday or Thursday of that week because she called in sick.  *Id*. ¶ 104.  Plaintiff was not disciplined for missing the training sessions, *id*. ¶ 106; however, she was not offered the opportunity to make up the training.  *Id*. ¶ 105.

Rosenking also missed one of the sessions due to a medical procedure.  *Id*. ¶ 99.  AXIS also did not schedule a session for Rosenking to make up the session.  *Id*. ¶ 100.

F.      Santiago's Continuing Performance Challenges

Robinson suggested to Santiago that she could use Brown as a resource in the event that she ever needed any assistance with entering the booking for Glastal's book of business.  *Id*. ¶ 110.  Brown was junior to Santiago, but she had supported Glastal prior to the restructuring.  *Id*.  Santiago asked Brown questions when she needed help with her job duties and Brown answered those questions.  *Id*. ¶ 111.  However, Plaintiff continued to fail to delegate her clerical tasks and to struggle to perform substantive work.  *Id*. ¶ 112.

On April 7, 2017, Robinson had a discussion with Santiago.  *Id*. ¶ 113.  According to a follow-up email Robinson sent to Santiago, Santiago would be placed on a verbal warning for the following 60 days, with the expectation that she would improve her performance.  The email stated: "It is . . . important for you to know that there must be immediate and sustained improvement in your performance during this time period and after, if [sic] your performance does not improve, you will be placed on a written warning and subject to termination."  Dkt. No. 45-24 at 2.  Robinson provided Santiago with a write-up of the talking points from the performance discussion.  *Id*. ¶ 114.  The issues identified in the warning included: (1) Renewal Delegation: failure to effectively partner with Glastal and "work up" expiring accounts; (2) Managing Work: failure to manage the book of business, including examples of "glaring errors"; (3) Communication with UW: failure to complete necessary tasks and failure to inform Glastal of

6

this fact; (4) Failure to Delegate Clerical Tasks: continued prioritization of these duties, which prevented her from keeping up with more pressing substantive work. *Id.* ¶ 115.  In the warning, Robinson informed Plaintiff that "[i]f you require training on any process, I need for you to contact me so that training can be scheduled for you." *Id.* ¶ 116.  On April 18, 2017, Plaintiff responded to Robinson's email, stating: "I know it is just as hard for you, Bill and everybody else involved.  I am sorry, and don't understand this is happening.  A giant opportunity for growth, graciously humbled, Carmen." *Id.* ¶ 118.

In the weeks following the verbal warning, Plaintiff continued to have performance challenges. *Id.* ¶ 125.  On April 12, 2017, Plaintiff failed to include a renewal in Glastal's April renewal report. *Id.* ¶ 126.  On April 13, 2017, Plaintiff incorrectly submitted a renewal account as "incidental" instead of "accidental," resulting in the renewal account being initially unapproved for binding. *Id.* ¶ 127.  On April 17, 2017, Glastal emailed Plaintiff pointing out a number of errors she had made on a Risk Evaluation for a client. *Id.* ¶ 128.  Glastal sent several emails to Robinson during this period regarding Plaintiff's continued mistakes. *Id.* ¶¶ 129, 130.  Glastal stated that Plaintiff made mistakes "involv[ing] tasks that are not complex," *id.* ¶ 131, that he had "to constantly review her work since [he was] not comfortable with her accuracy, communications skills and her attention to detail," *id.* ¶ 132, and stated that he was unable to use her for his "higher level service needs" because he was not "getting a favorable work product on simpler tasks." *Id.* ¶ 133.  Glastal noted that "[t]his continues to affect my production and my ability to successfully market, underwrite and bind business for our team and offer a professional product to my customers." *Id.* ¶ 134.  Glastal attached a document recounting a number of mistakes Plaintiff had made. *Id.* ¶ 135.

On May 16, 2017, Robinson emailed Plaintiff, writing that, going forward, she should set aside time with Haustman in the morning to go over items sent by Glastal. *Id*. ¶ 138. Thereafter, Plaintiff had daily calls with Haustman to address her work. *Id*. ¶ 142. Plaintiff was the only UA in U.S. Excess Casualty who had these daily check-ins, because she was the only UA struggling to perform her job duties. *Id*. ¶ 144. The record shows that Haustman responded to numerous inquiries from Santiago about how to perform substantive tasks.

Despite receiving daily assistance from Haustman, Plaintiff continued to make errors and struggle with accuracy. *Id*. ¶ 170. As a result of Plaintiff's continued struggles, on June 15, 2017, Robinson met with Plaintiff and issued her a final warning, placing her on a 30-day Performance Improvement Plan ("PIP"). *Id*. ¶ 172. The PIP required Plaintiff to check in with Haustman on a daily basis to outline her plan of assignments for the day. *Id*. ¶ 175. The PIP also required Santiago to have a weekly meeting with Robinson, at which they were to review her progress. Id. ¶ 174. Plaintiff was told that if she did not "immediately demonstrate and sustain improvement in [her] overall job performance," her employment would be terminated. *Id*. ¶ 178.

G.   Santiago's Termination

On June 19, 2017, Glastal emailed Santiago, copying Robinson stating: "As discussed, the quote that you drafted and just provided to me is incorrect." Dkt. No. 45-32 at 2. In response, copying both Robinson and Wright, Santiago wrote: "Bill, you don't think, this is a little overboard here, I can't even ask you question, that you take advantage to use it to have something negative to email out." Dkt. No. 60 ¶ 181. Wright emailed Robinson, stating that he "didn't want this type of relationship between UA and Underwriter" and that he was "not sure

where this is leading regarding Carmen, but I don't want it to be detrimental to the production

process." *Id.* ¶ 182.

During the period from June 26, 2017 to June 30, 2017, Santiago made several mistakes

that required Glastal to undo what she had set in motion. *Id.* ¶ 187. Santiago sent a binder out

for an important renewal account without first checking to make sure it was approved to send.

*Id.* ¶ 188. The binder was not finalized, necessitating Plaintiff to try and recall the email from

the broker, but she was unable to do so. *Id.* ¶ 189. Glastal reported that this mistake

compromised his relationship with the broker and jeopardized his standing as an UW because the

binder needed the approval of his manager before it could be sent to the broker. *Id.* ¶ 190.

Glastal also reported that Santiago made another similar error during the week. *Id.* ¶ 192. At the

conclusion of the week, Plaintiff left for vacation. *Id.* ¶ 193.

On July 5, Robinson emailed McKellar, Madderom, and Laura Botaro ("Botaro"), Vice

President of Human Resources, updating them on Santiago's progress. *Id.* ¶ 185. Robinson

pointed out a number of performance deficiencies, including the sending of the incomplete

binder and another incident in which Santiago sent a binder to a broker without Glastal's

approval. Dkt. No. 45-33 at 3. The email also indicated that Santiago was on vacation starting

June 30, and that she had been charged with providing a status update on six accounts for Glastal

before she left. *Id.* According to the email, she had not done so, and Robinson was required "to

ask a UA and USA to step in," so that she could provide Glastal with details of his accounts. *Id.*

Robinson stated that: "Carmen continues to compromise quality and rush through work; Carmen

does not follow simple instructions." *Id.* She concluded that she was "really concerned that

Carmen is not improving," that "Carmen's actions last week indicate that Carmen's work is

worse instead of better," and that "[t]he work and critical business relationships are being

compromised on an ongoing basis." *Id.* McKellar and Madderom agreed that AXIS should move forward to with the termination. Dkt. No. 60 ¶ 198.

On July 20, 2017, Robinson and Botaro met with Plaintiff to communicate the termination decision. *Id.* ¶ 199. During the meeting, Plaintiff was offered a severance package of $12,000, which she declined. *Id.* ¶ 200.

## PROCEDURAL HISTORY

On or about April 25, 2018, Santiago filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶ 201. The EEOC issued a no probable cause decision and granted Santiago Notice of Right to Sue. *Id.* ¶ 202. On December 19, 2018, Plaintiff filed a Complaint in this Court. On April 30, 2020, Defendants filed their motion for summary judgment. Dkt. No. 42. Plaintiff filed her opposition on August 24, 2020, Dkt. No. 58, and Defendants replied on September 14, 2020. Dkt. No. 63.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008),

and the movant bears the burden of demonstrating that "no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. Of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Chiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockerfeller & Co., Inc.*, 258 F.3d 62, 69 (2d. Cir. 2001)) (internal citation omitted).

However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137.

Because Plaintiff is proceeding pro se, her work product is to be "generously and liberally construed," *Kadosh v. TRV,Inc.*, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994), in her favor, and the Court holds her filings to a "less stringent standard than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Pro se plaintiffs are entitled to "special solicitude" when a court is "confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).

## DISCUSSION

Employment discrimination claims under Title VII are governed by the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, a plaintiff bears the initial burden of making out a prima facie case.  To make out a prima facie case, a plaintiff is required to show that: (1) she was a member of a protected class; (2) she was qualified for the job in question; (3) an adverse employment

action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009). In discrimination cases, the burden of establishing a prima facie case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also*, *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir. 1997) ("The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal."). However, a plaintiff cannot establish a prima facie case based on "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 859 F.2d 989, 998 (2d Cir. 1985).

"Employment discrimination claims brought under the NYSHRL are evaluated under the same standards that govern Title VII." *Xiang v. Eagle Enterps., LLC*, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42, n.1 (2d Cir. 2000)). Claims under the NYCHRL's employment provisions are also evaluated according to the *McDonnell Douglas* burden shifting framework, but are construed more broadly than state or federal discrimination claims. *See Cobert v. FSA Store, Inc.*, 2020 WL 1989404, at *3 (S.D.N.Y. Apr. 27, 2020). "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal citations and quotation marks omitted).

If a plaintiff can meet the initial burden of showing a prima facie case, "the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the [adverse employment action]. If the defendant does so, the burden returns to the plaintiff to show that the real reason for [the adverse employment action] was" her membership in a protected class. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).

Defendants do not dispute that Plaintiff has satisfied the first and second elements of the prima facie case; it is undisputed that, as a Hispanic woman, she is a member of a protected class, and that she held the basic qualifications necessary for her position.  Thus, only the third and fourth prongs of the prima facie test are at issue.

In support of her prima facie case, Plaintiff has put forth two alleged adverse employment actions: First, she claims that she was not adequately trained for her responsibilities after the restructuring; and second, she claims that she was terminated due to performance issues resulting from inadequate training.  Dkt. No. 58 at 10.[1]  The Court addresses these two allegations in turn.

A.      Failure to Train

A plaintiff suffers an adverse employment action when she "endure[s] a materially adverse change in the terms and conditions of employment."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities."  *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 22 (2d Cir. 2015).

An employer's failure to train an employee can constitute an adverse employment action.  Employer-provided training is a benefit of employment protected by Title VII.  42 U.S.C. § 2000e-2(d).  In order for failure to train to constitute an adverse employment action, a plaintiff must show that other employees were offered training and that she was denied that training.  *See Ani v. IMI Sys., Inc.*, 2002 WL 1888873, at *5 (S.D.N.Y. Aug. 15, 2002).  "Denial of training

---

[1] Defendants have briefed the issue of Santiago's changed job responsibilities after she was assigned to Glastal in the restructuring.  Santiago has not argued in her brief that the changed job responsibilities constituted an adverse employment action, and accordingly, the Court does not consider the argument.

can constitute an adverse employment action where it 'bear[s] on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation.'" *Hill*, 467 F. Supp. 2d at 352 (quoting *Nakis v. Potter*, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004)). However, "[w]hen an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action." *Id*. at 352.

Santiago's failure to train claim rests upon two incidents. First, AXIS sent Moore to Alpharetta to receive training in February 2017, while she was not invited to attend. Dkt. No. 58 at 10. Second, Santiago points to the in-person training held at AXIS in March 2017. Although she was invited to attend that training and participated for one day, she missed two days due to illness. She argues that AXIS's failure to reschedule the training for her, given her evident need for more training to satisfy her new, heightened job responsibilities, constituted an adverse employment action.

Santiago has shown that there is at least a triable question that the failure to train her constitutes an adverse employment action. She has shown, with respect to Moore's trip to Alpharetta, that AXIS provided training to other employees and that she was not invited to participate in the training. Furthermore, Plaintiff has also put forth evidence to create a triable issue of material harm—that her ultimate termination was connected to a lack of knowledge caused by inadequate training. It is undisputed that for years, Plaintiff worked for Wright, who did not require her to perform the more substantive components of her job description and instead emphasized clerical work. After the restructuring and Plaintiff's corresponding reassignment to support Glastal, Plaintiff was expected to perform the more substantive parts of the job description, such as New Business Delegation and Renewal Delegation. The training

was, at least in part, connected to those more substantive parts of the job description and Plaintiff's ultimate termination was a consequence of her continued difficulties in performing those functions. That evidence is sufficient to satisfy Plaintiff's burden to demonstrate an adverse employment action.

Although Plaintiff has adequately shown a triable issue that AXIS's failure to train her constituted an adverse employment action, Plaintiff has not put forth evidence that gives rise to an inference of discrimination. An inference of discrimination can be proven with direct or indirect evidence. *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). The requirement of producing evidence to support an inference of discrimination "is a flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. 2018) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). Such evidence may take a "variety" of forms, including "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Espinoza v. N.Y.C. Dep't of Transp.*, 304 F. Supp. 3d 374, 389 (S.D.N.Y. 2018) (quoting *Littlejohn*, 795 F.3d at 312 (2d Cir. 2015)). "[T]he fact that an employer favored someone outside of the relevant protected class will ordinarily suffice to sustain an inference of discrimination." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 601 n.9 (2d Cir. 2016). "In assessing the record to determine whether there is a genuine issue to be tried," a court must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 87 (2d Cir. 2016) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

Santiago acknowledged at her deposition that no one at AXIS ever made a discriminatory statement to her on the basis of her race or national origin.  Dkt. No. 45-3 at 257.  She also acknowledged that no one at the company ever mentioned her race or ethnicity as playing a role in the evaluation of her performance, and that she never heard a comment that she felt was derogatory.  *Id.*  There is no evidence of ethnically degrading or invidious comments directed at her or at others.  Thus, Santiago cannot root an inference of discrimination in anything that was said in the workplace.

Santiago argues instead that the Court should find a triable inference of discrimination based on that the facts that: (1) she was the only Hispanic UA in Excess Casualty in the New York office after the restructuring; and (2) she was the only UA who was not given the training he or she needed in light of post-restructuring job responsibilities.  In particular, she claims she was treated differently than Moore, who was a black male.

The mere fact that Santiago was the only Hispanic UA in the Excess Casualty department cannot give rise to an inference of discrimination absent evidence that the fact that she was the only Hispanic UA in that department was the product of discrimination.  "A racial imbalance in the makeup of a workplace is insufficient, by itself, to demonstrate discrimination."  *Branch v. Sony Music Enter. Inc.*, 2001 WL 228108, at *6 (S.D.N.Y. Mar. 8, 2001).  Here, there were only four UAs in the U.S. Excess Casualty department during the relevant time period, one of whom (Santiago) was Hispanic, two of whom were black (Moore and Brown) and one of whom (Rosenkring) was white.  There is no evidence that this composition was the product of discrimination.  Indeed, the sample size of four is too small to draw any inference, in and of itself, that AXIS discriminated against Hispanics.  *See Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 374 (S.D.N.Y. 2013) (holding that a sample size of 28 "counsel[ed] against

heavily weighting statistical evidence."); *Risco v. McHugh*, 868 F. Supp. 2d 75, 105 (S.D.N.Y. 2012) ("The fact that [plaintiff] was the only Hispanic [] employee in the Education Center during the ten months of her employment, and her unsupported assertion that [her supervisor] would have treated her differently if she had been [] Caucasian, . . . does not supply sufficient evidence to establish . . . discrimination."); *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 329 (S.D.N.Y. 2007) ("Without . . . analysis and interpretation of why and how it came to be that Plaintiff was the only African-America manager at Defendant's . . . operation during [his manager's] tenure, that fact in isolation is of limited value to the Court.").

Plaintiff also cannot create an inference of discrimination solely on the basis of evidence that she needed training and failed to receive it.  Employees do occasionally need training or assistance with existing or new job responsibilities; not everyone is immediately well-suited to a position in which they are placed.  Title VII, however, does not create a right to such training, or create a freestanding obligation on an employer to provide it, absent any independent evidence of discrimination—such as evidence showing that training is provided to others similarly situated but not members of the protected group.  To raise an inference of discrimination on the basis of disparate treatment including failure to train, a plaintiff must show "that the employer . . . treated [her] less favorably than a similarly situated employee outside his protected group."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 180-81 (S.D.N.Y. 2009) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 38-39 (2d Cir. 2000)).  "For a 'disparate treatment' analysis to apply, a plaintiff must be similarly situated 'in all material respects' to the individuals with whom [she] seeks to identify himself."  *Tillman v. Luray's Travel*, 137 F. Supp. 3d 315, 332 (E.D.N.Y. 2015) (quoting *Wali*, 678 F. Supp. 2d at 180-81)).  A plaintiff must show that the comparators were "subject to the same standards governing performance evaluation and discipline, and must have

engaged in conduct similar to the plaintiff's." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999).

Santiago's claim fails, because she has not produced evidence that she was treated differently from her similarly situated co-workers. The only AXIS employee who was sent to the February 2017 training was Moore. But Moore was not similarly situated to Santiago as he had been transferred into U.S. Excess Casualty from a different department and was provided training precisely because he was new to U.S. Excess Casualty and needed to be trained on account of the move.[2] Moore was not given the training for remedial purposes, or because he was demonstrating a lack of knowledge of the job he already had. Instead, he was being retrained for a position in a new department, as demonstrated by the fact that the Alpharetta training included general training on the U.S. Excess Casualty department and its business. All of this was new to Moore. Further, Moore, a UA, held a more junior title than Santiago, who held the title of Senior UA.

Unlike Moore, Plaintiff was not new to U.S. Excess Casualty and the information regarding the U.S. Excess Casualty department and its business also would not have been new to her. She had worked in the division for thirteen years. Thus, Moore is not an appropriate comparator. *See Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25 (2d Cir. 2017) (holding that an employee who had spent over a decade in a job was not similarly situated to an employee who was newly hired).

---

[2] Defendants argue that Moore needed training, in part, because U.S. Excess Casualty used a different process for coding information from that used in Property. Dkt. No. 60 ¶ 80. Plaintiff disputes this. However, Plaintiff does not dispute, as a general matter, that Moore required training because of his move from Property to U.S. Excess Casualty. *Id.* ¶ 79.

To the contrary, the appropriate comparators would be Santiago's co-workers Rosenking and Brown.  Both worked in U.S. Excess Casualty during and after the restructuring and each held a position junior to Santiago's position.  But, like Santiago, neither Rosenking nor Brown was sent to the Alpharetta training or received any other additional training and thus Plaintiff has not produced evidence that she was treated differently than others similarly situated because of her race.  Indeed, like Moore, Brown is black, and she was new to the Wholesale division, having been transferred when the Retail division was shuttered.  But, despite those facts, she did not receive training.  Thus, in addition to there being no inference that Plaintiff was denied training because of her race, no inference also can be drawn that Moore received training because of his race.  The evidence is unrebutted that there was no disparate treatment.  Moore received training because he was new to the business.  Plaintiff did not receive training because she—like others—had been in the business for years and was expected to understand it and be able to perform her responsibilities.  AXIS was permitted to provide Moore training without taking on an obligation to provide training to others already in the business.

Similarly, Plaintiff cannot show that she was disparately treated with respect to the March 2017 training.  Plaintiff missed two days of the training because of illness, and AXIS did not schedule make-up trainings for her.  Rosenking, a white male, however, also missed one of the training sessions for medical reasons and was not offered a make-up session.  The evidence does not support an inference that Plaintiff was denied a make-up session because of her race.  Make-up sessions were denied to all employees who missed days of the training, regardless of their race.

Finally, Santiago's discrimination claim is undermined by the undisputed fact that, for years, she reported to the same individuals who made the decision to terminate her without issue.

Under the law, where a supervisor treats an employee in a protected class favorably (or not unfavorably) for years, an inference arises that subsequent adverse action by the supervisor taken against the employee is not motivated by animus to the employee based on her membership in a protected class.  After all, if an employee's membership in a protected group does not inhibit a supervisor from taking favorable action toward the employee, it is difficult to draw the inference that the employee's membership in a protected class was a substantial factor when the employer all of a sudden takes adverse action against the employee.  *See Connell v. Consol. Edison of N.Y., Inc.*, 109 F. Supp. 2d 202, 210 (S.D.N.Y. 2000) ("Because the same people who approved an incentive award for plaintiff only the year before made the decision to discharge him, this factor also suggests that discrimination was not a cause of his layoff.").

That is the case here.  Prior to the restructuring, Santiago was supervised by Robinson and McKellar.  She received discretionary bonuses and merit salary increases.  Robinson and McKellar both participated in the decision to terminate Santiago, and it was Robinson who informed Santiago that she had been terminated.  Although these facts would not alone be dispositive of Plaintiff's motion, they support the Court's conclusion that there is no triable issue of fact here.

B.    Termination

Santiago additionally attempts to make out a prima facie case of employment discrimination based on the contention that she was terminated for discriminatory reasons. Termination, as Defendants agree, is an adverse employment action.  The only contested element of the prima facie case is thus whether Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination.

Plaintiff fails to show facts giving rise to an inference of discrimination in connection with her termination.  She has not offered any evidence that would give rise to an inference of a discriminatory motive on the part of her employer, other than the bare fact that she is Hispanic and was terminated.  Plaintiff has testified that she was never subjected to any discriminatory remarks during the time she worked at AXIS; nor has she alleged that she received disparate treatment from any other employees not in her protected class with respect to her termination.  A court cannot find an inference of discrimination based on the plaintiff's race and the fact that she suffered an adverse employment action alone.  *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) (finding that a plaintiff must do more than "cite to their mistreatment and ask the court to conclude that it must have been related to their race").  In the absence of any concrete evidence suggesting discriminatory animus, no inference of discrimination will arise. *Bickerstaff*, 196 F.3d at 448 (holding that a court "must . . . carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.").

C.   Legitimate, Non-Discriminatory Reasons

Even if Plaintiff had made out her prima facie case, Defendants have shown that there were legitimate, non-discriminatory reasons for Santiago's termination and that showing has not been rebutted with evidence offered by Plaintiff.  Poor performance constitutes a legitimate, non-discriminatory reason for terminating an employee.  *See Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action."); *see also Chukwurah v. Stop & Shop Supermarket Co. LLC*, 354 F. App'x 492, 495 (2d Cir. 2009); *Davis v. Avaya, Inc.*, 295 F. App'x 380, 381-82 (2d Cir. 2008) (holding that poor

performance is legitimate, nondiscriminatory reason for termination); *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (holding that a failure to "perform satisfactorily" is a legitimate, nondiscriminatory reason for dismissal).

Santiago has conceded that she struggled to perform the tasks assigned to her after she was reassigned from Wright to Glastal as part of the restructuring. The undisputed record shows that Santiago was prone to making mistakes and some of those mistakes affected Glastal's relationships with AXIS's clients. It also shows that those mistakes persisted notwithstanding the daily check-ins she had with Haustman at which Haustman provided Santiago with detailed feedback on her work along with detailed explanations of how to carry out her principal job responsibilities. It also reflects that the errors continued even after AXIS provided Santiago with a detailed PIP with clear goals and objectives for improving her performance. AXIS terminated Plaintiff's employment only after her mistakes persisted and continued negatively to impact Glastal's ability to perform his job. Plaintiff does not dispute that her performance did not meet the necessary standard. Thus, the record supports a finding that AXIS had legitimate, nondiscriminatory reasons for terminating Santiago.

Plaintiff has not offered evidence sufficient to create a genuine issue that the reasons AXIS has provided for her termination were pretextual. Plaintiff argues that there are "troubling discrepancies between Defendants' current positions and the contemporaneous records." Dkt. No. 58 at 16. She challenges Defendants' statement that she was a substandard employee by pointing to her performance evaluations, which reflected that she "met expectations" in most years prior to the restructuring. She argues that, while she "technically" was not disciplined for missing two days of the March 2017 training, she was criticized for missing it and was told that she would not be provided with make-up sessions. She points out that, although Defendants

criticize her for making errors on an April 2017 risk evaluation, another UW emailed Glastal to say "I ok'd this one since you weren't in on the day she was trying to get work completed. What's the issue."  Dkt. No. 60 ¶ 129.  Finally, she argues that Defendants mischaracterize her meetings with Haustman as being for training purposes, when the real purpose was testing and quality checking of her work.

These arguments are insufficient to show that the core reasons Defendants have articulated for terminating her were pretextual.  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 470 (2d Cir. 2001) (holding that, where plaintiffs did not put forth evidence that defendant's "stated non-discriminatory reasons for the challenged employment actions were false," there was no evidence of pretext).  It is undisputed that the reviews she received for work performed prior to restructuring were for work different than the work she was assigned and failed adequately to perform after the restructuring.  Prior to the restructuring, Wright did not require Santiago to perform the substantive aspects required of someone with her job description. After the restructuring and reassignment, Plaintiff was required to perform the substantive tasks associated with her job.  The reviews that she received prior to the restructuring when she was not asked to perform substantive work thus do not demonstrate that the later critiques of her substantive work were pretextual.  Finally, Plaintiff's employment was not terminated for missing the training sessions or for her conduct during the meetings with Haustman.  Thus, whether or not her characterization of the Haustman meetings and defendants' criticism of her for missing the March 2017 training sessions is credited, those characterizations would not show that the reasons proffered by defendant for terminating her employment were pretextual.

D.      Failure to Promote

In her brief in opposition, Santiago raises for the first time an argument based upon AXIS's failure to grant her a promotion to Unit Coordinator she requested in or around 2013-14. She alleges that McKellar denied the promotion, telling her "[w]e don't want to set you up for failure." Dkt. No. 58 at 14. She further alleges that in 2016, she approached Robinson about a promotion to Unit Coordinator, but was told that the position required leadership skills. *Id.* at 14-15.

Plaintiff cannot raise this claim at this point in the litigation. Plaintiff did not include these allegations in her EEOC charge. Because Santiago has not exhausted her administrative remedies with respect to this claim, the Court has no jurisdiction to hear these arguments. *See Short v. Dillon, Read & Co.*, 2 F. Supp. 2d 260 (E.D.N.Y. 1997) (dismissing a failure to promote claim where plaintiff had failed to exhaust administrative remedies where the claim was not reasonably related to a discriminatory treatment claim).[3]

E.      Claims under the NYCHRL

Claims under the NYCHRL are analyzed under the *McDonnell Douglas* burden-shifting framework. However, its provisions are to be interpreted "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109. Under the NYCHRL, "the plaintiff need only show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons. . . . [The defendant] is entitled to summary judgment on this basis only if the record established as a

---

[3] In addition, the claim is not contained in her complaint, and a party cannot raise new claims in a brief in opposition to summary judgment. *See Beckham v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407-08 (S.D.N.Y. 2000).

matter of law that discrimination played *no* role in its actions." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013).

Even under the more liberal standards of the NYCHRL, the plaintiff must still present some evidence of discriminatory animus. *See Mihalik*, 715 F.3d at 110 (holding that, even under the NYCHRL, "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive."). As discussed above, Plaintiff has not done so here. In the absence of a single comment or incident suggesting that discriminatory motives caused AXIS and its employees to terminate Santiago, nor any evidence of disparate treatment, she has not satisfied her burden under the NYCHRL. Accordingly, her claim cannot go forward.

F.   Claims Against Individual Defendants

Plaintiff's Title VII claims against the Individual Defendants must be dismissed. There is no individual liability under Title VII. *See Shaw v. McDonald*, 2015 WL 8484570, at \*6 (S.D.N.Y. Dec. 8, 2015) ("The Second Circuit has determined that the remedial provisions of Title VII do not provide for individual liability."). Moreover, "an employer's agent may not be held individually liable under Title VII, even if she has supervisory control over the Plaintiff." *Boyd v. Presbyterian Hosp. in City of N.Y.*, 160 F. Supp. 2d 522, 534 (S.D.N.Y. 2001). Therefore, Plaintiff's Title VII claims against Robinson, Glastal, McKellar, and Madderom must be dismissed.

The NYSHRL and the NYCHRL, on the other hand, do authorize individual liability in discrimination cases in certain circumstances. The NYSHRL allows for individual liability for a supervisor who participates in the conduct giving rise to the discrimination. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995). The NYCHRL, by contrast, creates direct liability for discrimination against "an employee or agent" of the employer. N.Y.C. Admin. Code § 8-

107(1)(a).  Liability only exists under either law if the individual either "actually participates in the conduct giving rise to [the] discrimination," *Feingold*, 366 F.3d at 158, or "aids and abets" that discrimination.  *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014).

However, "liability under the [NYS]HRL and the NYCHRL must first be established as to the employer/principal" before an individual may be held liable under either law.  *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999); *see also Maynard v. Montefiore Med. Ctr.*, 2021 WL 396700, at *15 (S.D.N.Y. Feb. 4, 2021) ("[Individual liability under the NYSHRL] liability is solely 'derivative,' i.e., the employer must be liable as a principal . . .") (quoting *Osborne v. Moody's Invs. Serv., Inc.*, 2018 WL 1441392, at *7 (S.D.N.Y. Mar. 22, 2018)).  And, as discussed above, Plaintiff has not adequately shown that AXIS was liable under the NYSHRL and NYCHRL.  Accordingly, her state and city law claims against the Individual Defendants must fail.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to close the motion at Dkt. No. 42 and to close the case.  The Clerk of Court is respectfully directed to mail a copy of this order and a notice of the right to an appeal to Plaintiff.

SO ORDERED.

Dated: February 16, 2021
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge